Robert F. Zeddies v. Commissioner.
Zeddies v. Commissioner
Docket No. 57280.
United States Tax Court
T.C. Memo 1958-14; 1958 Tax Ct. Memo LEXIS 215; 17 T.C.M. (CCH) 63; T.C.M. (RIA) 58014; January 31, 1958
*215 Held: Respondent's determinations with respect to the income received by petitioner, a candy broker, during the taxable years 1944 to 1947, inclusive, as commissions, profits on the purchase and sale of candy and as his distributable share of the net income of a partnership engaged in packaging candy for retail, sustained with certain adjustments. Respondent's disallowance of certain expenses incurred by petitioner sustained with certain adjustments. At least a part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. John J. Yowell, Esq., for the petitioner. George T. Donoghue, Jr., Esq., and J. Bruce Donaldson, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax and additions *216 to tax of petitioner as follows: Addition to Tax
Year
Deficiency
Sec. 293(b)
1942
$ 1,348.65
$ 674.33
1943
7,120.66
4,537.48
1944
13,696.59
7,798.77
1945
71,006.44
35,724.67
1946
137,212.93
68,606.47
1947
41,301.98
20,650.99
At the hearing, respondent conceded that no part of the deficiencies for 1942 and 1943 was due to fraud with intent to evade tax, and that the deficiency for each of those years is barred by limitations under section 275, Internal Revenue Code of 1939. Respondent has also conceded, on brief, that petitioner correctly reported $2,222.88 received as commissions from certain companies in the year 1944 and, accordingly, that petitioner understated his gross income from commissions in that year by no more than $638.47 instead of $2,861.35 as determined in the notice of deficiency. In an amendment to his answer to conform to proof respondent alleged that petitioner understated his gross income from commissions for the years 1945 and 1946 in the respective amounts of $2,064.28 and $22,650.08 instead of $1,925.53 and $22,440.70 as determined in the notice of deficiency. The issues remaining for decision are: (1) Whether *217 petitioner understated his income from commissions in each of the years 1944 to 1947, inclusive; (2) Whether petitioner failed to report on his tax returns profits from the purchase and sale of candy, confections and similar products in each of the years 1944 to 1947, inclusive; (3) Whether petitioner received but did not report on his income tax returns a share of the distributable income of the partnership of Frank W. Brinkman & Associates for each of the years 1945 and 1946; (4) Whether respondent correctly determined that petitioner overstated certain business expenses claimed as deductions in each of the years 1944 to 1947, inclusive; (5) Whether any part of the deficiency for any of the taxable years in issue was due to fraud with intent to evade tax. Findings of Fact Petitioner filed income tax returns for the years 1944 to 1947, inclusive, with the collector of internal revenue for the first district of Illinois. During these years he resided in Kenilworth, Illinois. For many years petitioner was a food broker and salesman in the Chicago, Illinois area. Most of the time, he represented a number of candy manufacturers who sold their products to retail grocery stores. *218 Petitioner paid his own expenses in this business and the manufacturers paid him commissions for his services. He acted as a representative for candy manufacturers throughout the taxable period. After the beginning of World War II, candy and the ingredients used to manufacture it - primarily sugar and corn syrup - were in short supply. The Office of Price Administration placed ceiling prices on the sale of candy. Sugar and corn syrup were rationed. The maximum ceiling on candy sold by manufacturers was based on the manufacturer's prewar price. Retailers' ceiling prices were based on the cost of the candy to the retailer plus a certain percentage of mark-up over cost. Because of these restrictions, some manufacturers of candy established quotas for their customers under which they sold candy to former customers on a percentage of purchases made before the war. By 1942, Kroger Grocery & Baking Company (hereinatfer referred to as Kroger), which operated a chain of retail grocery stores in 19 states, was one of petitioner's customers. Kroger had formerly manufactured its own candy for sale in its stores, but rationing of sugar sharply curtailed this activity. As a result, Kroger was *219 unable to supply its stores with sufficient quantities of candy. In addition, because it had done little business with candy manufacturers before the war, Kroger had few sources of supply among candy manufacturers. Kroger hired petitioner to procure candy for its stores through his contacts with candy manufacturers. As a Kroger representative, petitioner was assigned a desk at the Kroger office in Chicago and was furnished a stenographer. Otherwise, petitioner bore his own expenses in procuring candy. Kroger paid petitioner a five per cent commission on all candy purchased by Kroger through petitioner's efforts. Usually, petitioner and Kroger representatives would discuss the type and price of candy that petitioner could obtain. Petitioner would then buy candy from various sources and arrange to have it sold to Kroger in retail units. The price of the candy sold by petitioner to Kroger would include packaging costs and a profit to a packaging company. When petitioner bought candy in bulk, he frequently sold it to East India Nut Company (hereinafter referred to as East India), a packaging concern. East India would pack the candy in retail units and resell it to Kroger. East India *220 paid petitioner a five per cent commission on such sales. Petitioner received from East India during the taxable period commissions of $331.80 in 1944; $1,196.25 in 1945; $10,393.01 in 1946; and $323.23 in 1947. Included in the commissions from East India in 1946 were commissions totaling $5,479.82 which had been billed to East India by petitioner (on invoices of Zerna Products Company) as sales of chocolate peanuts. Petitioner also did business with Kroger through Carol Lynn Products Company (hereinafter sometimes referred to as Carol Lynn), a candy packaging partnership in which petitioner had a 50 per cent interest. Carol Lynn received candy obtained by petitioner, packaged it and sold the candy to Kroger. Petitioner received from Carol Lynn commissions of $17,591.76 in 1946 and $9,167.51 in 1947. Petitioner did not report the above commissions from East India and Carol Lynn on his tax returns. Neither Carol Lynn nor East India reported the commissions paid to petitioner by filing Forms 1099 with respondent. During the taxable period petitioner received commissions as follows: Year
Commissions
1944
$41,061.17
1945
45,856.36
1946
79,811.97
1947
48,431.44
*221 On his tax returns, petitioner reported total commissions as follows: Year
Commissions
1944
$40,422.70
1945
43,792.08
1946
57,161.89
1947
38,960.22
Petitioner's unreported income from commissions was as follows: Year
Commissions
1944
$ 638.47
1945
2,064.28
1946
22,650.08
1947
9,471.22
During the years 1944 to 1947, inclusive, petitioner bought bulk candy at wholesale prices from many manufacturers. He stored this candy either at the place of business of East India or in a Chicago warehouse. Petitioner conducted this part of his business in his own name and as Zerna Products Company. Petitioner paid for all of the candy out of his own funds and received the proceeds from the candy which he sold. All invoices from the suppliers of the candy were received by petitioner. Petitioner issued invoices for candy that he sold. In conducting this business, petitioner used an office furnished him free of charge by East India. No formal books and records of the kinds, quantities or costs of candy were kept by petitioner. He had no bookkeeper to record his business transactions and did not maintain a journal or ledger to record purchases *222 and sales during the taxable years. Part of the candy consisted of spoiled or unsaleable candy. Some of this candy was repurchased from Kroger under an agreement between petitioner and Kroger that if candy procured for Kroger by petitioner did not sell quickly or spoiled, petitioner would buy it back at Kroger's cost if the candy was in a warehouse or at the retail price if the candy was in one of the retail stores. Kroger also maintained a salvage department to sell to the highest bidder candy that was unfit for retail sale. Petitioner occasionally made the highest bid on some of this salvage candy even though it was not candy which he had procured for Kroger. Whenever possible, petitioner sold or traded the spoiled and inferior candy. The principal purchaser of spoiled candy was William Schmeckebier. Most of the candy repurchased by petitioner from Kroger stores was resold to Schmeckebier at a profit. Petitioner's purchases of candy from suppliers at ceiling prices during the taxable years were as follows: Supplier
1944
1945
1946
1947
Peanut Specialty Co.
$18,097.43
$134,902.42
$ 28,296.27
Druckerman Brokerage Co.
9,955.50
6,566.23
Carol Lynn Products Co.
21,930.36
900.00
2,040.00
Kroger
35,542.10
30,702.24
11,431.18
Joseph A. Riggi Co.
554.40
2,025.00
90.00
Independent Candy Co.
7,177.33
16,934.35
1,293.60
9,760.41
Crystal Pure Candy Co.
9,532.95
11,720.31
E. J. Brach & Sons
55,443.23
133,388.98
Peerless Candy Co.
3,426.57
Regal Candy Co.
2,175.60
Peiffer Food Products
21,680.56
Totals
$7,731.73
$97,955.81
$244,905.54
$224,973.94
*223 Petitioner's sales of candy to customers during the taxable period were as follows: Customer
1944
1945
1946
1947
William Schmeckebier
$ 39,006.64
$ 80,569.80
$ 7,632.50
East India Nut Co.
$13,654.20
107,152.16
109,543.91
57,628.90
Carol Lynn Products Co.
4,914.93
104,542.23
3,780.00
Kroger
69,304.01
183,858.48
Universal Food Products
4,770.00
H. H. Evon, Inc.
7,250.20
Joseph A. Riggi Co.
4,503.60
John Harms
362.12
Totals
$13,654.20
$155,843.73
$363,959.95
$265,015.80
In addition to paying the invoice price of candy which he purchased, petitioner made "overceiling" payments to manufacturers and candy brokers. These payments were "bonuses" in excess of the ceiling price and were made in cash or in ingredients for use in candy manufacturing. The invoices of candy purchased in this manner did not reflect the "bonus" payment but included only the manufacturer's ceiling price. Petitioner included the "bonus" payment in the price which he quoted to hs customers for the candy. Petitioner's principal retail customer, Kroger, knew that the cost of certain candy included overceiling payments, but Kroger *224 was willing to pay the higher cost in order to satisfy the demand of its customers for candy. If Kroger could have purchased candy directly from manufacturers at ceiling prices without petitioner's services, it would have done so. Petitioner made overceiling payments of $2,000 in 1944; $20,000 in 1945; $40,000 in 1946; and $10,000 in 1947. Petitioner's unreported income from sales of candy during the taxable period was as follows: 1944
$ 3,922.47
1945
37,887.92
1946
79,054.41
1947
30,041.86
On November 1, 1944, petitioner and Frank W. Brinkman formed a partnership to conduct a candy brokerage business in Chicago, Illinois. The partnership operated under the names Frank W. Brinkman & Associates and Carol Lynn Products Company. Petitioner advanced $5,000 initial capital to the partnership. Brinkman devoted his entire time to the conduct of the business. Petitioner and Brinkman agreed to share the partnership profits equally. Partnership returns of Frank W. Brinkman & Associates for the taxable years 1945, 1946 and 1947 reflected petitioner's share of the net income or loss of the partnership as follows: Share of Partnership
Year
Income or Loss
1945
$1,096.30
1946
1,433.79
1947
(1,945.87)
*225 Petitioner received letters from Brinkman informing him of the amount of his share of the partnership income or loss. In January of 1946, petitioner received $1,096.30 as his distributive share of the net income of the partnership. Petitioner did not report any part of his distributive share of partnership income or loss for any of the years 1945, 1946 or 1947. Respondent determined that petitioner's correct distributive share of partnership income or loss was as follows: Share of Partnership
Year
Income or Loss
1945
$12,936.08
1946
6,644.91
1947
( 173.97)
In conducting his business of buying and selling candy, petitioner incurred losses during the taxable years. Because of the inferior ingredients used in candy manufacture during the war, some of petitioner's candy spoiled in warehouses so rapidly that it could not be resold and was either dumped out or used as hog feed. A substantial amount of the candy disappeared as a result of pilferage and "shrinkage." On occasions during the years 1944 to 1947, petitioner paid for nylon hose, boxes of candy, radios and other items which he gave as "prizes" to Kroger employees who had promoted the sale of candy *226 procured by him for Kroger. These prizes were offered to accelerate the sale of candy which might spoil if not sold quickly and would then have to be repurchased by petitioner. Petitioner claimed substantial business expenses on his tax returns. Many of these deductions were disallowed by respondent. The amounts of expenses claimed by petitioner, the amounts allowed by respondent, and the amounts disallowed are as follows: 1944
1945
1946
1947
Purchase of "slow-moving" and
Spoiled candy: Claimed
$12,500.00
$ 7,700.00
$ 6,050.00
$ 6,500.00
Allowed
500.00
400.00
300.00
300.00
Disallowed
$12,000.00
$ 7,300.00
$ 5,750.00
$ 6,200.00
Prizes for sales promotions: Claimed
1,200.00
1,500.00
1,200.00
1,200.00
Allowed
0
0
0
0
Disallowed
$ 1,200.00
$ 1,500.00
$ 1,200.00
$ 1,200.00
Sales promotion: Claimed
3,000.00
2,800.00
3,000.00
1,900.00
Allowed
3,000.00
2,800.00
2,500.00
1,900.00
Disallowed
$0 $0
$ 500.00 $0
Entertainment of buyers and pur-
chasing agents: Claimed
6,200.00
3,600.00
6,200.00
2,800.00
Allowed
2,200.00
1,600.00
1,600.00
1,000.00
Disallowed
$ 4,000.00
$ 2,000.00
$ 4,600.00
$ 1,800.00
Travelling expense: Claimed
6,000.00
8,800.00
12,000.00
4,600.00
Allowed
4,000.00
4,000.00
4,000.00
2,000.00
Disallowed
$ 2,000.00
$ 4,800.00
$ 8,000.00
$ 2,600.00
Inventory loss: Claimed
6,830.37
7,950.00
5,920.00
Allowed
0
0
0
Disallowed
$ 6,830.37
$ 7,950.00
$ 5,920.00
Auto expense: Claimed
750.00
750.00
1,450.00
825.00
Allowed
750.00
750.00
750.00
825.00
Disallowed $0 $0
$ 700.00 $0
Totals of disallowed expense
$19,200.00
$22,430.37
$28,700.00
$17,720.00
*227 The correct amounts of expenses incurred by petitioner during the taxable years are as follows: 1944
1945
1946
1947
Purchase of slow-moving and spoiled candy
$ 500
$ 400
$ 300
$ 300
Sales promotion prizes
100
100
100
100
Sales promotion
3,000
2,800
2,500
1,900
Entertainment
2,200
1,600
1,600
1,000
Traveling expense
4,000
4,000
4,000
2,000
Inventory loss
1,000
1,000
1,000
Auto expense
750
750
750
825
Totals
$10,550
$10,650
$10,250
$7,125
Petitioner's income tax returns for the years 1944, 1945 and 1946 were prepared by Walter Lampert, a member of the Illinois bar, who worked for petitioner during the taxable period. Lampert prepared the returns on the basis of information furnished by petitioner. Petitioner did not furnish Lampert with complete documentary evidence to support the business deductions claimed on the returns. Petitioner did not inform Lampert of the amounts of his distributive share of net income of Frank W. Brinkman & Associates for 1945 and 1946, nor did he inform Lampert of the amount of commissions he received in 1946 from the partnership operating under the name Carol Lynn Products Company. *228 Lampert did not sign the returns that he prepared because he did not believe that there was sufficient substantiating evidence to support the information contained in them. Petitioner's income tax return for 1947 was prepared by A. J. Weber, an accountant, on the basis of information supplied by petitioner. Petitioner did not furnish any records to support the deductions claimed on the return. Petitioner did not inform Weber of any income from Carol Lynn in the form of commissions, profits from sales of candy or partnership income. In 1947, a revenue agent conducted an examination of petitioner's income tax returns for the years 1944 and 1945. Petitioner and Lampert were asked to produce petitioner's books and records including bank statements, cancelled checks and other documents relating to the years under examination. Petitioner and Lampert produced no records other than a list of companies that paid petitioner commissions during the years under investigation. The total commissions listed were the same as the totals listed on the tax returns for 1944 and 1945. Petitioner informed the agent that he had no income in addition to the commissions reported and that he was not engaged *229 in any business other than as a candy broker. In 1948, respondent's agents made a re-examination of petitioner's income tax returns for 1944 and 1945 and an original examination of his returns for the years 1946 and 1947. This examination began after leads were obtained during an investigation of Schmeckebier. Petitioner was again asked to produce the books and records for the years under examination. The only records produced were records and canceled checks of the partnership Frank W. Brinkman & Associates and some of petitioner's own cancelled checks. Petitioner produced no substantiating evidence to show the purpose for which the checks were issued. Petitioner did not produce the names of any of his candy suppliers or customers nor did he produce any purchase and sales invoices showing procurement and disposition of candy. Petitioner did not maintain complete records of all of his sales of candy and did not furnish the agents with documentary evidence substantiating the deductions claimed on his returns. The agents obtained their information as to petitioner's purchases and sales of candy from the books and records of suppliers and customers of petitioner, trucking companies *230 and warehouses. From these records, the agents traced shipments of candy from the supplier to petitioner and then to the ultimate customer. Petitioner did not furnish the agents with a "workbook" showing all of his purchases and sales of candy during the taxable years. At least part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. Opinion During the taxable years petitioner was engaged in the candy brokerage business. He represented candy manufacturers who sold their products to retail grocery stores and he received commissions for these services. In addition to these activities, petitioner was hired by a large retail grocery chain to procure candy when shortages of that commodity developed after the outbreak of World War II. Petitioner also received a commission on candy that he procured. Because of his unique position as a representative of both candy suppliers and candy purchasers petitioners engaged in numerous transactions involving sales and purchases of candy in bulk lots. Respondent has determined that petitioner failed to report the correct amount of commissions and profits that he received from these transactions, that he overstated *231 many of the expenses incurred by him in conducting his business, and that at least part of the deficiency in each taxable year was due to fraud with intent to evade tax. 1. Commissions Respondent determined that petitioner failed to report substantial amounts of income from commissions on his income tax returns for the years 1944 to 1947, inclusive. Because of inaccuracies in the original computation brought out at the hearing, respondent amended his answer to conform to the evidence of omitted commissions. Respondent conceded that petitioner correctly reported commissions of $2,222.88 from Kroger, East India, and Crystal Pure Candy Company in 1944 and has eliminated this amount from the computation of omitted commissions for that year. For the years 1945 and 1946, however, the evidence revealed greater amounts of omitted commissions than respondent had originally determined. Petitioner offered no evidence to rebut respondent's determination as to the amount of commissions omitted by petitioner from his tax returns, and we have made findings reflecting the correct amounts of unreported income from this source. A recomputation will reflect respondent's concession with respect *232 to the year 1944. Because of other concessions made in petitioner's favor in regard to issues which will be discussed subsequently, respondent did not claim increased deficiencies as a result of the increased amounts of omitted commissions for the years 1945 and 1946. Those increased amounts, however, will be reflected in a recomputation for those years. 2. Profits from Sales of Candy. Respondent further determined that petitioner failed to report on his tax returns profits from sales of candy in each of the years 1944 to 1947, inclusive. Petitioner argues that the transactions involving purchases and sales of candy were undertaken by him as a Kroger representative and as an agent for candy manufacturers. He insists that he was interested only in making commissions from the purchases and sales and that he was not in the business of buying and selling candy for his own account. The evidence clearly refutes petitioner's claim that he was not in the business of buying and selling candy for his own account. The facts disclose that throughout the taxable period, petitioner bought bulk candy at wholesale prices from manufacturers, paid for it out of his own funds and received invoices *233 from the suppliers for the shipments. From this source, petitioner made sales to numerous customers. It is true that some of these customers, notably East India and Carol Lynn, were primarily packaging concerns doing business with Kroger and that they paid petitioner commissions on candy procured for packaging. However, petitioner has not shown that all sales to Kroger rewarded him only with commissions. On the contrary, a former Kroger candy buyer testified that during 1945 and 1946 there were transactions in which petitioner made no commissions but did make a profit from the sale. Petitioner himself admitted that he made frequent sales of inferior and spoiled candies to William Schmeckebier. Many of these sales were of inferior candy originally purchased by Kroger through petitioner which Kroger required petitioner to take back. Obviously, the inferior goods sold to Schmeckebier were disposed of by petitioner for his own account and not for Kroger. When these facts are coupled with the evidence that petitioner himself issued invoices for sales of candy, received the proceeds of the sales and operated this part of his business in his own name (and under the name Zerna Products Company), *234 it is clear that petitioner engaged in the business of buying and selling candy for profit during the taxable years. Although petitioner did not maintain a ledger reflecting all of his purchases and sales, respondent's agents were able to trace almost all of petitioner's candy purchases to an ultimate customer. This information was obtained from the records of petitioner's suppliers and customers, including trucking company records and warehouse records. Approximately 95 per cent of all candy purchases made by petitioner during the taxable period were traced from known suppliers of candy through petitioner's hands to the ultimate customers. Only five per cent of the purchases made by petitioner were from suppliers who were unknown. In only one instance was the ultimate buyer of candy from petitioner unknown. Petitioner's cost of candy purchased by him was determined on the basis of invoice price. Where no invoice information was available to show cost, 10 per cent of the sales price to the customers was estimated as representing petitioner's profit. This estimate was lower than the normal profit margin as reflected in the purchases and sales for which invoices were available. *235 In our findings we have set out the amounts of petitioner's costs of candy purchased from wholesalers at ceiling prices during the taxable years and his receipts from sales of candy to customers during the taxable period. These findings are based on a tabulation placed in evidence by respondent which shows in detail the date, type of candy, weight, unit price and total amount of purchases and sales made by petitioner during the taxable period. Petitioner conceded that the tabulation was correct with two exceptions: (1) sales to William Schmeckebier in 1945, 1946 and 1947 and (2) purchases and sales in which either the supplier or customer was unknown. On brief, respondent eliminated from the tabulation all purchases and sales for which either the supplier or customer was unknown, and conceded that its original determination of sales to William Schmeckebier should be reduced by $1,134 in the year 1946. These concessions have been reflected in our findings. Respondent did not concede, however, that all sales to Schmeckebier should be eliminated from its tabulation, as petitioner now contends. Petitioner attacks respondent's tabulation of sales to Schmeckebier on the ground that information *236 as to the amount of such sales was obtained from false invoices made by Schmeckebier. To support this claim, petitioner testified that he never gave any invoices to Schmeckebier, but that he did leave blank invoices at certain of his places of business and that Schmeckebier took some of these blanks on which he made false records of purchases from petitioner. However, respondent's tabulation of sales of candy from petitioner to Schmeckebier was not based on information contained in invoices. In the light of the detailed evidence contained in respondent's tabulation tracing purchases of bulk candy through petitioner to the ultimate customer, Schmeckebier, it was incumbent upon petitioner to show that respondent's evidence of sales to Schmeckebier was erroneous. This petitioner failed to do. Four slips of paper offered by petitioner to show certain sales of candy to Schmeckebier in 1945 were received in evidence only for the purpose of establishing that the handwriting thereon was that of Schmeckebier. Petitioner never proved that the information appearing on the slips of paper was a correct record of transactions which contradicts certain of the items appearing on respondent's tabulation. *237 Furthermore, when asked by respondent's counsel if he had any record of the amounts he received from sales to Schmeckebier, petitioner testified that he had only the slips of paper and his "work book." The work book was never produced and offered in evidence. Under these circumstances, it is clear that petitioner has failed to discredit respondent's evidence of candy sales to Schmeckebier. Petitioner's principal argument is that respondent's tabulation is an incorrect record of his buying and selling activities because it does not take into account "overceiling" payments made to candy manufacturers. Petitioner, and some of his former employees, testified to many instances of "bonus" payments made to candy suppliers in violation of OPA price ceiling regulations. According to petitioner, he was a "go-between" who had been instructed by Kroger to procure candy by any means that he could. This testimony is corroborated to some extent by the testimony of a former Kroger official that Kroger could not obtain candy through normal channels at ceiling prices, yet Kroger would not jeopardize its reputation by directly engaging in illegal activities. Petitioner was therefore employed as a means *238 of procuring candy obtainable only at overceiling prices. The official further testified that if Kroger could have obtained candy directly from suppliers at ceiling prices without petitioner's services, it certainly would have done so. If petitioner's testimony and that of his corroborating witnesses is credible, it would appear that a common practice in the candy business during the taxable years was the payment of "bonuses" in excess of the legal ceiling price to candy suppliers, and that petitioner made such payments in the course of his business. Petitioner's testimony as to overceiling payments is contradicted by the testimony of three of respondent's witnesses - John Lavazzorio, president of Peanut Specialty Company, Dave Druckerman, of Druckerman Brokerage Company, and Solomon Hoit, of Independent Candy Company; all of whom had supplied candy to petitioner during the taxable period. These three individuals denied receiving from petitioner any cash payments in excess of ceiling prices for candy sold to petitioner by their companies. If their testimony is believed, much of petitioner's testimony is demonstrably false. By the same token, if petitioner and his supporting witnesses *239 told the truth, the testimony of the candy suppliers is unworthy of belief. Under these circumstances, the credibility of the witnesses and our evaluation of their testimony is of crucial importance. See David J. Pleason, 22 T.C. 361, affd. 226 Fed. (2d) 732 (C.A. 7, 1955), certiorari denied 350 U.S. 1006. Petitioner testified that he made a cash payment of $27,000 in April of 1946 and a similar payment of approximately $9,000 in the fall of that year to John Lavazzorio, president of Peanut Specialty Company. Payment of these amounts is corroborated by the testimony of Frank Blakeslee, a disinterested witness who was the candy buyer for the Kroger grocery chain during 1945 and 1946, and by the testimony of three of petitioner's former employees. Lavazzorio denied receiving any such payments. Respondent's tabulation of petitioner's purchases of candy from Peanut Specialty Company discloses, however, that petitioner received approximately five times as much candy from that company after the alleged cash bonuses were paid as he had received before such payments. The inference is strong that something more than petitioner's ability as a salesman *240 induced Lavazzorio to supply petitioner with such large quantities of a commodity which at that time was universally in demand. After careful consideration of the conflicting testimony and all other circumstances, we have concluded that Lavazzorio's testimony denying the receipt of overceiling payments from petitioner in 1946 is unworthy of belief. We reach the same conclusion with respect to the testimony of Druckerman and Hoit. Although neither petitioner nor any other witness was able to recall the exact amounts and dates of payments, the testimony of Druckerman and Hoit that they did not receive any overceiling payments from petitioner does not ring true. Candy was in short supply during the taxable years and retailers were desperate to get it. Petitioner was in constant contact with candy suppliers and admittedly did not hesitate to pay overceiling prices to obtain merchandise. Petitioner's employees were aware of these activities, as were officials of the Kroger Company. After observing their demeanor and appearance on the witness stand, we have concluded that both Druckerman and Hoit did accept "bonus" payments to supply candy. Both testified that petitioner was not an old *241 customer of long standing and that he had no candy quota with them. Yet both admitted that they readily supplied him with candy during the taxable period. The reasons they offered for dealing with petitioner do not seem compelling, and we think that the true reason behind their cooperation with petitioner was the payment of overceiling "bonuses" by petitioner to them. Their testimony denying such transactions is not worthy of belief. It does not follow, however, that all of petitioner's claims are valid. The record reveals a glaring lack of documentation of the overceiling payments testified to by petitioner and other witnesses. No records of these transactions were introduced into evidence, except for a few of petitioner's canceled checks bearing self-serving notations such as "expense" and "overage." Petitioner's own recollection of these instances was hazy and the testimony of his corroborating witnesses did not supply the missing details. In one instance, petitioner was able to recall an overceiling payment in 1945 of 20 cents per pound on a purchase of 57,283 pounds of chocolate pastels, a recollection corroborated by the testimony of his partner, Frank W. Brinkman, and certain *242 entries appearing on respondent's tabulation of purchases and sales. In the main, however, petitioner's argument that his profits were offset by overceiling payments to candy suppliers rests upon random references to secret cash payments, to procurement of corn syrup for manufacturers, and to other unsubstantiated expenditures. Faced with the unreliable testimony of respondent's witnesses on the one hand and petitioner's failure to substantiate his claims on the other, we cannot conclude either that petitioner made no overceiling payments, as contended by respondent, or that all of the profit from sales of candy was offset by overceiling payments, as contended by petitioner. Our conclusion is that part, but not all, of petitioner's profit from sales of candy represented overceiling payments to candy suppliers. David J. Pleason, supra.In the exercise of our best judgment and upon the basis of the available evidence, we have found that petitioner made overceiling payments of $2,000 in 1944, $20,000 in 1945, $40,000 in 1946, and $10,000 in 1947. Cohan v. Commissioner, 39 Fed. (2d) 540. These payments are a part of petitioner's cost of goods sold and must *243 be subtracted from gross receipts to determine gross income. Lela Sullenger, 11 T.C. 1076. Accordingly, we have found that petitioner's unreported income from sales of candy during the taxable period was $3,922.47 in 1944; $37,887.92 in 1945; $79,054.41 in 1946; and $30,041.86 in 1947. 3. Partnership Income. Respondent determined that petitioner failed to report his distributive share of the partnership income of Frank W. Brinkman & Associates for the years 1945 and 1946 and that he failed to report his share of the partnership loss for 1947. Petitioner contends that this determination was erroneous. In his petition, petitioner claimed that he held the partnership interest as trustee for the benefit of his children. There is no evidence, other than petitioner's own self-serving statements, of any such trustee relationship. The allegation is squarely contradicted by the testimony of petitioner's partner, Brinkman, that petitioner was unequivocally entitled to 50 per cent of the partnership income or loss. Petitioner himself admitted in his testimony that he was an equal partner and that his children did not report the partnership income or loss on their tax returns. *244 Brinkman informed petitioner of the amount of partnership income or loss, and petitioner admitted receiving and cashing a check representing his distributive share of the partnership income for 1945. Petitioner has offered no evidence contradicting respondent's determination. Accordingly, that determination is sustained. 4. Business Expenses. Respondent has disallowed certain business expense deductions claimed by petitioner on his tax returns. In our findings, we have set out the amounts claimed by petitioner as deductions, the amounts allowed by respondent, and the amounts disallowed. Since petitioner makes no argument on brief with respect to some of the disallowed items, only those expenses which are now in dispute will be discussed. Petitioner claimed substantial deductions as a result of alleged losses from the purchase of "slow-moving" and spoiled candies. Respondent has disallowed all but a small fraction of these expenses on the ground that petitioner failed to substantiate them. The facts show that in order to get the Kroger business petitioner agreed to repurchase from Kroger candy which did not sell quickly or which became spoiled in Kroger stores. Respondent's tabulation *245 of petitioner's purchases and sales of candy during the taxable period, however, reveals no purchases of candy from Kroger in 1944 and discloses that all candy purchased from Kroger in 1945, 1946, and 1947 was resold by petitioner at a profit. Petitioner's testimony that he sold much of the repurchased candy at a loss is uncorroborated and petitioner was unable to produce any records to support the claimed losses. We therefore hold that respondent was correct in his determination of allowable deductions for losses incurred in the purchase of slowmoving and spoiled candy. Petitioner's attack upon respondent's disallowance of all "inventory" losses claimed by petitioner on his returns is more meritorious. There is testimony in the record that in the candy business during the taxable years the rate of spoilage was high because of the inferior quality of candy available at that time. One witness testified that some of petitioner's candy became so spoiled that it could not be salvaged and was either dumped or used as hog feed. Other witnesses corroborated petitioner's claim that he sustained losses from spoilage and "shrinkage" of candy stored in warehouses or with East India. One witness *246 estimated that petitioner lost as much as 10 per cent of part of his candy as a result of pilferage by employees of packaging concerns where petitioner stored his goods. Considering all of the evidence, we have concluded that petitioner's "inventory" losses amounted to $1,000 for each of the years 1945, 1946, and 1947. Cohan v. Commissioner, supra.Respondent's disallowance of any amounts claimed by petitioner in excess of $1,000 for each of these years is sustained. Petitioner also contests respondent's disallowance of expenses claimed by petitioner as prizes given to promote the sale of candy which he furnished Kroger. Respondent admits that during the years 1944 to 1947, inclusive, petitioner paid for nylon hose, boxes of chocolate candy, and other articles delivered as prizes to Kroger employees, but contends that petitioner failed to prove the exact cost of such items in each year. The evidence of expenditures for prizes is meager. One of petitioner's former employees testified that these prizes consisted of nylon hose, a few football tickets and an occasional radio to a manager of a particular store. Even petitioner's own testimony and his evidence of checks *247 that he allegedly cashed to pay for prizes does not reveal that he incurred the substantial expenses for prizes claimed on his returns. However, because the record does reveal, and respondent concedes, that there is some evidence of expenditures for sales promotion prizes, we have found upon the basis of the available evidence that petitioner spent $100 in each taxable year for prizes. Cohan v. Commissioner, supra.Respondent correctly disallowed all alleged expenses for prizes in excess of this amount. The remaining contested expense item is the claimed deduction for entertainment of buyers and purchasing agents. Petitioner's argument with respect to the disallowance of part of this expense is that he represented manufacturers, as well as Kroger, during the taxable period and that "it is reasonable to assume that in the course of this phase of his business he had expenses in the entertainment of buyers and purchasing agents." The only evidence offered to support the claimed entertainment expenses consisted of certain canceled checks. In his testimony, petitioner did not relate these checks to specific instances involving entertainment of candy suppliers, nor did he *248 furnish additional details to substantiate his claim. Moreover, respondent's allowance of $2,200 for the year 1944, $1,600 for each of the years 1945 and 1946, and $1,000 for the year 1947 for entertainment expense was generous in view of the lack of competent documentary evidence to support the claimed deductions. Respondent's disallowance of the remaining entertainment expense claimed by petitioner was therefore correct. 5. Fraud. Our finding that at least part of the deficiency for each of the taxable years in issue was due to fraud with intent to evade tax is supported by clear and convincing evidence. In each of the taxable years petitioner received cash profits in excess of costs on sales of candy. He did not report the profit resulting from any such sale on his tax returns for any of the taxable years. He also substantially understated his income from commissions during the taxable period and did not report any of the commissions he received from two of his customers. In one instance he deliberately attempted to conceal his commission by receiving it in the form of receipts from the sale of chocolate peanuts. Petitioner further did not report any income from the partnership *249 of Frank W. Brinkman & Associates, and he falsely claimed that he held such income in trust for his children. He did not maintain adequate records correctly reflecting his income from sales of candy and supporting the deductions he claimed on his returns. Petitioner refused to cooperate with the investigating agents and did not supply them with the names of his suppliers, invoices showing purchases and sales, or records of profits. His testimony from the witness stand was evasive and self-serving. On several occasions, he contradicted his own prior testimony in such a manner as to cast serious doubt upon his credibility. When all of these circumstances are added together, it is clear that petitioner's failure to report substantial amounts of income for the years 1944 to 1947, inclusive, was deliberate and fraudulent. David J. Pleason, supra.
Decision will be entered under Rule 50.